R E C E I V E D
Clerk's Office
USDC, Mass.
Date 5-7-07
By _____ CMG _____
Deputy Clerk

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------------------

| | | |
|---|---|---|
| SANTO RUIZ, | ) | |
| VIRGILIO RUIZ, | ) | |
|     PLAINTIFFS | ) | **07 CA 10903 MLW** |
| | ) | |
| V. | ) No. | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| THE STATE OF MASSACHUSETTS, | ) | |
| THE CITY OF BOSTON, ET AL. | ) | MAGISTRATE JUDGE _Dein_ |
|     DEFENDANTS. | | |

-----------------------------------------------------

John Ashcroft, U. S. Department of Justice

John Ashcroft, Federal Bureau Of Prisons

John Ashcroft, Immigration & Naturalization Services

John Snow, U. S. Treasury Department

Thomas Perret, Bureau Of Alcohol Tobacco and Firearms

Mitt Romney, Commonwealth of Massachusetts

Stephen D. Coan, State Fire Marshals

Thomas M. Menino, City of Boston

William A. Sommers, Boston Inspection Services

Paul F. Evans, Boston Police Department

Paul Christian, Boston Fire Department

Galo Vasquez, Boston Arson Squad

Thomas May, NStar Company

Richard W. Goodus, Commerce Insurance Co.

Robert Gold, Harry Gold & Sons, Insurance Agency

David Miserandino, Samuel McCormack Co.

Daniel Cronin, Phoenix Investigations, Inc.

James L. Collins, East Coast Investigations

Betty Clark, St. Paul Fire & Marine Insurance Co.

Delroy Tucker, Tronic Security Systems

David Leria, Amcest Alarm Monitoring Systems

Silvia Hamilton, Landlord-The Mass. Property Underwriting, Inc. Co.

John Greenaway, Greenaway Construction-Disposal, Inc.

John C. Doherty, Attorney at Law

Matthew Feinberg, Feinberg & Kamholtz

Matthew Kamholtz, Feinberg & Kamholtz

John F. Palmer, Offices of John F. Palmer

Melvin Norris, Offices of Melvin Norris

James S. Dilday, Grayer & Dilday

Rafael William Ruiz, Columbus Market

-------------------------------------------------

## JURY TRIAL DEMANDED

### *COMPLAINT*

This a federal lawsuit pursuant to the Fredom of Information Act (FOIA), for judicial disposition

and judgment against the U. S. of America, for its responsibilities, and the ones taken over the above

actors, as explained below, subsequent to the fire that partially destroyed the building at 1951-1955

Columbus Avenue, Roxbury, MA, on December 16, 1990.

As presented below, respectively, defendant and its actors met, conferred, combined, colluted,

conspired with each other (or deliberately, or recklessly disregarded plaintiffs), orchestrating a

collusion that resulted in emotional, physical, and economical damages-pains and sufferings in

violation of plaintiffs" civil rights. Beyond all of this, defendant evaded every opportunity to produce

exculpatory evidence, by denying local and state reports of inspections; retained and/or disposition of

properties; as well as the grand jury transcripts, but not limited to, relevant to incident in question.

Therefore, defendant is hereby committed to respond to the denial of FOIAs in the local, state and

federal levels, as specified in paragraphs, 5-7, 319, 326-327, but not limited to,.inthis complaint.

The grand jury transcripts are the true reflection of the injustice that started behind plaintiffs" back, and they would be the only window to correct said injustice. These transcripts would connect to other direct evidence to back up plaintiffs" assertions. Plaintiffs exhausted all the steps to claim said transcripts as specified.

According to the facts presented below, but not limited to, defendant is not immunded, even under the presumption that the actors were acting under color of law. They falls into the liability for their actions and inactions.[1]

## PARTIES

1) Plaintiff Santo Ruiz ("Santo"), is a resident at 9 Starr King Ct., Apt. 950, charlestown, MA 02129; and citizen of the Dominican Republic.

2) Plaintiff Virgilio Ruiz ("Virgilio"), is a resident at Calle 6 No. 7, 30 de Mayo, Bani, Prov. Peravia, Republica Dominicana, and citizen of the Dominican Republic.

3) The U. S. of America is a defendant through the

(a) U. S. Department of Justice or the U. S. Attorney General, John Ashcroft ("Ashcroft"), and branches, i. e., Federal Bureau of Prisons ("BOP") and "Immigration"

---

[1] A separate complaint was as to all defendants was filed on June 23, 2003; and amended on June 3, 2004,. However, even though the main defendant overcame the responsibilities of the rest of the deefendants, to understand the case as a whole, , the matter is recited herein, completely.

1

liability under their actions and inactions.

# PARTIES

1) Plaintiff Santo Ruiz ("Santo"), is a resident at 9 Starr King Ct., Apt. 950,

charlestown, MA 02129; and citizen of the Dominican Republic.

2) Plaintiff Virgilio Ruiz ("Virgilio"), is a resident at Calle 6 No. 7, 30 de Mayo, Bani,

Prov. Peravia, Republica Dominicana, and citizen of the Dominican Republic.

3) The U. S. of America is a defendant through the

(a) U. S. Department of Justice or the U. S. Attorney General, John Ashcroft

("Ashcroft"), and branches, i. e., Federal Bureau of Prisons ("BOP") and "Immigration"

and Naturalization Service, at 950 Pennsylvania Ave., N. W., Room 4545, Washingon, DC

20530; and

      (b) U. S. Treasury Department or John Snow ("Snow"), through the Bureau of
          Alcohol,
      (c) Tobacco

and Firearms ("ATF") or agent Thomas Perret, at 1500 Pennsylvania Ave. N. W.,

Washington, DC 20226.

---

1    The complaint was originally filed on June 23, 2003. Without jurisdiction , the court

of Appeals expressed an informal opinion. Overcoming this, plaintiffs are hereby

amending it accordingly to the actual facts and Rule 15 (a), Fed. R. Civ. Pro.

4

4) With the exception of David Leria or "Amcest" Alarm Monitoring Systems, who is a resident of the State of New Jersey, at ; the rest of the defendants are presumed residents of the Commonwealth of Massachusetts with their businesses as follows (this presumption applies as to their U. S. citizenship as well).

5) Mitt Romney ("Romney") as governor of the Commonwealth of Massachusetts, is a defendant through the State Fire Marshals, as well as its executive of Public Safety, Stephen D. Coan ("Coan"), at Public Safety, State Rd., P. o. Box 1025, Stow, MA 01775 or at Governor's Office 360 State House, Room 360, Boston, MA 02133.

6) Thomas M. Menino ("Menino") as mayor of the City of Boston, is a defendant through its governmental departments at the Boston City Hall, One City Hall Sq., Boston, MA 02201, as follows:

(a) Boston Inspection Services-Department ("Inspection"), or its executive William A. "Sommers" or Kevin J. "Joyce", at 1010 Massachusetts Avenue, Boston, Ma 02118;

(b) Boston Police Department ("BPD"), or its commissioner Paul F. Evans or Kathelyn "O'toole", at 154 Berkeley St., Boston, MA 02116;

(c) Boston Fire Department ("BPD"), or its commissioner Paul "Christian", at 420 Massachusetts Avenue, Boston, MA 02201;

(d) Boston Arson Squad ("Squad"), or the fire leader investigator, Galo "Vasquez" or Roy "Burril", at 920 Massachusetts Avenue, Boston, MA 02201;

7) Thomas May ("May"), as executive of "NStar", i. e., Boston Gas and Boston Edison, is a defendant at 800 Boylston Street, Boston, MA;

8) Richard W. Goodus ("Goodus"), as executive of "Commerce" Insurance Company, is a defendant at 211 Main st. or 11 Gore Rd., Webster, MA 01570;

9) Robert Gold ("Gold"), as executive of "Harry Gold & Sons", Insurance Agency, is a defendant at 200 Boyston St., Chestnut Hill, MA 02467.

10) David Miserandino ("Miserandino"), as executive-adjuster of Samuel "McCormack" Company, is a defendant at 922 Forbes Rd., Braintree, MA 02188;

11) Daniel Cronin ("Cronin"), as executive of "Phonix Investigations", Inc., is a defendant at Buzzards Bay, MA 02532.

12) James L. Collins ("Collins"), as executive (with Tony Pagan), of the "East Coast" Investigations, is a defendant at 436 Southbridge St., Auburn, MA ;

13) Betty Clark ("Clark"), and/or Carl Westerman ("Westerman"), as executive of St. Paul Fire & Marine Insurance Company ("Worker Compensation Insurance "), is a defendant at 50 Staniford St. suite 700, Boston,MA 02114;

14) Delroy Tucker ("Tucker"), as executive of "Tronic" Security Systems, Inc. is a defendant at 259 Fuller St., Dorchester, MA;

15) Sylvia Hamilton ("Hamilton") as landlord or her representative The Massachusetts Property Insurance "Underwriting" Company, is a defendant at 2 Center Plaza suite 800, Boston, MA 02108;

16) John Greenaway ("Greenaway") as executive of "Greenaway" Construction-Disposal, Inc., is a defendant at 1955 Columbus Avenue, Roxbury, MA 02119;

17) John C. Doherty ("Doherty") as representative of his own Attorney at law", is a

6

defendant at 12 Bartlett St., Andover, MA 01810.

18) Matthew Feinberg ("Feinberg") and Matthew Kamholtz ("Kamholtz") as attorneys at law, are defendants at FEINBERG & KAMHOLTZ , 125 Summer St., Boston, MA 02110.

19) John F. Palmer ("Palmer") as attorney at law, is a defendant at "Offices of John F. Palmer", 24 School St., 8th Floor, Boston, MA 02108.

20) Melvin Norris ("Norris") as attorney at law, is a defendant at "Offices of Melvin Norris", 260 Boston Post Road, Suite 09, Wayland, MA 01778.

21) James S Dilday ("Dilday") as attorney at law, is a defendant at GRAYER & DILDAY, 27 School St., Boston, MA 02108.

22) Rafael William Ruiz ("William"), as former owner of Columbus Market and be

2

beyond, is a defendant at 3 Morse St., Apt. #3, Dorchester, MA 02121;


## JURISDICTION


23) This court has jurisdiction over this matter pursuant to 28 USC S1332; 28 USCS1491 (a)(1); Etc

---

2 Plaintiffs are avoiding confussion with surnames or relatives, including brother William, as well , they have avoided any interference that may result from any relationship that thus, may affect the just resolution of this case, and any other, related to the whole matter.

## DEFENDANTS RESPONSIBILITIES

24) From about the year of 1986, defendant William, paragraph 22, supra, as owner of Columbus Market which was installed until about the begining of 1990 at the site of the incident in question, was responsible for its management through which he had encounters that, caused hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 22, 44-52, 55-60, 64, 70, 73, 95-96, 109, 118-121, 137-140, 179, 230G, 257, 260-261, 263-265, 267-270, 279-281, 283, 303.

25) From about July to December 23, 1994, as a paid standby counsel; and from about November, 1996, to June 9, 1997, as a paid official counsel, defendant Dilday, Paragraph 21, supra, was responsible for Virgilio's legal representation, through which with ineffective assistance he caused hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 21, 221-224.

26) From about July 18, 2001, to September 3, 2003, defendant Norris, paragraph 20, supra, as court appointed counsel was responsible for Virgilio's legal representation, through which with ineffective assistance caused hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 20, 289, 297-302, 304-306, 309-310, 312A-E, 314-317.

27) From about July 18, 2001, to September 3, 2003, defendant Palmer, paragraph 19, supra, as court appointed counsel was responsible for Santo's legal representation, which he represented so ineffective, as to cause hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 19, 289, 297-298, 301-302, 309-310, 312A-E, 315, 317.

28) From August 2, 1993, to December 23, 1994, i. e., pretrial, trial, and postrial

proceedings, defendants Feinberg and Kamholtz, paragraph 18, supra, as court appointed counsel were responsible for Virgilio's legal representation, which they represented so ineffective, as to cause hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 18, 153, 159-175, 177, 183, 187-220.

29) From August 2, 1993, to December 23, 1994, i. e., pretrial, trial, and postrial proceedings, as court appointed counsel; and from about June 1996, to January 30, 1998, as paid counsel, defendant Doherty, paragraph 17, supra, was responsible for Santo's legal representation, which he represented so ineffective, as to cause hardship and prejudice to laintiffs as specified, but not limited to, in paragraphs 17, 153, 176-178, 180-220, 225-229.

30) During the years preceding the incident in question, during this and further, as self employed, but retained by the owner of the building at 1951-1955 Coumbus Ave., Roxbury, MA, defendant Greenaway, paragraph, paragraph 16, supra, was responsible for the general maintainance of said building, including but not limited to, structure repairs, security, safety, utilities, i. e., replacement of gas-water-electrical pipes, etc., which he effected so poorly, as to cause hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 16, 84-93, 98, 101, 104, 117-118, 125-126, 131-132, 145-148, 197, 230A-H, 231A-F, 246.

31) From a date not known, but at least since the 1970's, during and after the incident in question, as owner of the specified building, defendant Hamilton, paragraph 15, supra, was responsible for overseeing its upkeep, such as, but not limited to, structure repairs, security, safety, utilities, i. e., replacement of gas-water-electrical pipes, smoke detectors, etc. all which she effected so poorly, as to cause hardship and prejudice to plaintiffs as specified, but not limited to, in paragraphs 15, 47-49, 73, 84-93, 98, 101, 104, 125-126,131,-132, 145-

148, 197, 230A-H, 231A-F, 229.

32) From September, 1990, as installer of the alarm system, under contract by plaintiffs for the security and safety of the store in the site in question, i. e., 1951 Columbus Ave., Roxbury, MA, defendant Tucker and/or his intercontracted carrier, defendant David "Leria", paragraphs 14, 4, respectively, was responsible for said alarm functions, including but not limited to, repair, upkeeping and overseeing the monitoring of signals, etc., which he failed to show in records for at least two of the three months since said installation, which caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 14, 75, 100-103, 234.

33) From September, 1990, as monitor of the alarm system, under intercontract by its installer, and thus, plaintiffs' contract, defendant Leria, paragraphs 4, 14, was responsible for the monitoring, overseeing and upkeeping of records of the signals produced by said alarm, which records defendant was unable to produce except for the preceding month of the incident in question, which caused or may have caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 4, 75, 100-103, 229, 234.

34) From a date not known, but subsequent to Virgilio's on-the-job accident on January 4, 1990, as his employer insurance carrier, defendant Clark and/or Westerman, paragraph 13, supra, was responsible for the handling of his compensation claim, through their worker compensation Insurance, i. e., St. Paul & Marine Insurnce Company, whose mishandling and instigation by interacting with third parties, sharing the process of said claim, caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 13, 54, 61, 99, 124-126, 141-144.

35) From a date not known, but subsequent to Virgilio's on-the-job accident on January

4, 1990, as investigator contracted by the worker compensation Insurance, defendant "Collins", paragraph 12, supra, through his firm, i. e., East Coast Investigations, was responsible for the handling of his investigation of Virgilio's claim, in which defendant's mishandling and instigation by interacting with third parties, sharing the process of said claim, caused hardship and prejudice to plaintiffs, as specified , but not limited to, in paragraphs 12, 54, 61, 99, 124-126, 130-133, 141-144.

36) From a date not known, but subsequent to the fire in question, as investigator contracted on  behalf of Commerce Insurance, defendant Cronin, paragraph 11, supra, through his "Phoenix Investigations", Inc., was responsible for the handling of his investigation as to said fire, in which defendant's mishandling and instigation by interacting with third parties, diverting this, sharing the process of the same, caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 11, 122-123, 126, 128-133, 135-142, 235A-J, 250.

37) From a date not known, but subsequent to the fire in question, as adjuster contracted on behalf of Commerce Insurance, defendant Miserandino, paragraph 10, supra, through his Samuel  "McCormack" Company, was responsible for the handling of his appraisal on the loss in the store in question for said fire, in which defendant's mishandling upon interacting with third parties, diverted and instigated, sharing the process of the same, and ultimately, caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 10, 122-123, 134-135.


38) From November, 1990, as agent of his carrier, Commerce Insurance, defendant Gold, paragraph 9, supra, through his "Harry Gold & Sons agency,"  upon insurance

contract for the store in question, between him and plaintiffs, was responsible for handling said contract and the loss as a result of said fire in question, in which defendant's mishandling by interacting with third parties, sharing the process with instigation and divertion of the same, which ultimately caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 9, 76-83, 145, 197, 230D, 233.

39) From a date not known, but subsequent to his agent Gold's interactions with plaintiffs, paragraph 38, supra, defendant Goodus, and/or representative, paragraph 8, supra, through his insurance carrier, "Commerce", upon being committed by contract that later was breached, was responsible of this, upon its handling for the loss as a result of the fire in question in the store, with interactions among third parties, sharing in the process, the instigation that diverted the proper course and ultimately, resulting in the eventual rejection and actual consequence that caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 8, 83, 135-136.

40) From the years preceding the fire and at least up to its occurrence, as a supplier of the natural gas and electricity utilities, through the then, BostonGas Co. and Boston Edison, respectively, defendant Thomas May, paragraph 7, supra, through NStar or its predecessor, was responsible for said supplies to the building of the incident in question, but not without making sure that these would not represent any hardship to the safety factor in said building, upon checking and repairing or causing others to check and repair any problems of the structure that could prevent the safety functions, such as, to wit, but not limited to, broken pipes or the like which could cause leaks of gas and/or electricity,
which as such, were eventually mishandled in the face of multiple gas leaks, specifically, upon its disregard with deliberate indifference, and then denial of these, including their own

12

records of service or documentaton for these, all which diverted the course of the whole matter and thus, caused hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 7, 50, 88, 90, 94, 200-201, 246, 251, 274B, 275, 284.

41) From the years preceding the fire, during its occurrence and beyond, as mayor of the city of Boston and during his predecessor, defendant Menino, Paragraph 6, subparagraphs a, b, c, and d, supra, through his commissioners of deparments, as follows in said order, was responsible for their conduct in making sure that in their functions as public officials, these would guarantee the safety factor free of misconduct and deliberate indifference, which in the instant case caused hardship and prejudice to plaintiffs, direct, and indirectly, as specified herein, paragraphs 6, 254, 256, and as follows, but not limited to:

(a) From the years preceding the fire, during its occurrence and beyond, as commissioner of the Boston Inspection Services-Department, defendant Sommers and/or his successor, Joyce, subparagraph (a) of paragraph 6, supra, was responsible for the inspection and making sure that the safety of the building in question be in proper functions, as to the utilities, i. e., gas and electricity supplies, to wit but not limited to; as to sanitation, i. e., rats and other rodents, etc. all which in the level of this inspection fell with deliberate indifference, and thus, failed to check and/or repair, or cause others to such, therefore causing hardship and prejudice to plaintiffs, as specified, but not limited to, in paragraphs 6, 50, 94, 106, 252;

(b) From the years preceding the fire, during its occurrence and beyond, as commissioner of the BPD, defendant Evans and/or his successor, O'toole, subparagraph (b) of paragraph 6, supra, was responsible for theofficial security and upkeeping of records of it, as to each and every incident in the building in question, such as but not limited to,

13

service as to: gangs disturbances; store alarm disturbances, i. e., December 7,  1990,but not

limited to; seizure of a briefcase from above said store on December 16, 1990; any further

assessment as to the incident of the fire, but not limited to, in which with deliberate

indifference, has caused hardship and prejudice to plaintiffs, as specified,

but not limited to, in paragraphs 6, 96-97, 100, 102-103, 119, 126, 138-140, 234, 245, 246,

278A-E, 284;

(c) From the years preceding the fire, during its occurrence and beyond, as

commissioner of the BFD, defendant Christian and/or his predecessor, subparagraph (c) of

paragraph 6, supra, was responsible for the official safety, implementation and upkeeping of

records, but not limited to, as to preventing, suppressing, reporting, analyzing, concluding

each and every incident of fire or potentiality of it, including but not limited to the ones in

the building in question, i. e., June 1, 1989; December 16,

1990; etc., in which with deliberate indifference, has caused hardship and prejudice to

plaintiffs, as specified, but not limited to, in paragraphs 6, 126, 12-129, 165, 198-199,

230E, 231E, 232, 237, 239-244, 276-277;

(d) From the years preceding the fire, during its occurrence and beyond, as leader

investigator of the Squad, defendants Vasquez and co-investigator, Burril, subparagraph (d)

of paragraph 6, supra, was responsible for the official investigation, reporting, analyzing,

concluding, and upkeeping of records, specifically, as to the fire in question, in which he

deliberately diverted the course of said investigation and thus, changed or caused to change

the conclusion of this and further upcoming results in a misconduct level that caused

hardship and prejudice to plaintiffs, as specified, but not limited to, in

paragraphs 6, 51, 58, 120-121, 126, 128-129, 147, 198-199, 236, 276, 278.

42) From the years preceding the fire, during its occurrence and beyond, as governor of

the Commonwealth of Massachusetts, defendant Romney, paragraph 5, supra, and/or

defendant Coan, through the State Fire Marshals, was responsible for the official public

safety, specifically, the building in question, as to its safety free of hardship caused by the

fire in question, through the proper training to wit, but not limited to, of said Fire Marshals,

in preventing the potentiality of fires, with implementation that guarantee said prevention,

as well as, the proper suppression, reporting, analysis and conclusion whenever these take

place, which in the instant case, was so poor as to cause hardship and prejudice to plaintiffs,

as specified herein, including but not limited to, in paragraphs 5-7,

253, 255.

43) Subsequent to the fire in question, and throughout the continuing proceedings, as

United States Attorney General (USAG), defendant Ashcroft, and  defendant Snow,

paragraph 3, supra,  respectively, through the  U. S. Department of Justice, and branches, i.

e., the BOP, and Immigration;  and the U. S. Treasury Department, and its branch, i. e., the

ATF, altogether  make the United States a defendant responsible for the deliberate

manipulation of the facts of the case in chief and then, with the same deliberate

indifference, the procedures in the federalization, prosecution and imprisonment of

plaintiffs, all which falsely and wrongly caused hardship and prejudice to plaintiffs, as

presented herein in the whole action, including from the general to the very specific, or

from the direct to the indirect actions and inactions as follows,  but not limited to: (A) U. S.

Dept. of Justice/ASHCROFT:  paragraphs 3-22, 43, 152-158, 197-199, 207-208, 258-259,

262, 266; (1) BOP: paragraphs 3, 227, 258, 273, 286, 290, 293A-D, F, H-I, K; (2) INS:

paragraphs 3, 273, 290-292, 293E, G, J-K, 294A, C-G, 295-296, 325; (B) U. S. Treasury Dept./SNOW: paragraphs 3, 148-152, 230F, 274A.

# FACTS

## A) THE PRE-FIRE EVENTS

44) In June, 1988, Virgilio moved to 1953 Columbus Ave., Apt. 1, Roxbury, MA, from Jamaica Plain, MA, just a few blocks away.

45) Virgilio moved as specified in paragraph 44, supra, because defendant William had offered him work at his store, Columbus Market which was right below said apartment, or the site of the incident in question-1951 Columbus Ave., in a semileveled basement.

46) While Virgilio was at William' store, he served as a clerk and as an interpreter for William.

47) While Virgilio was at William'store, he interpreted for William and whoever was at the otherside, including defendant Hamilton.

48) Every time that Virgilio interpreted for William and Hamilton, Virgilio could perceive a strong animosity between them, including occasions when she stated that she did not want William therein.

49) At the time that William had the store paragraph 45, supra, he also had leased the

apartment above the store as specified in paragragh 44, supra.

50) While Virgilio was at William' store, he called for him to different places, including to report smell of gas to Boston Gas company, which went there to check in their presence.

51) While Virgilio was at William' store, sometimes  William hung out with Mr. Miguel "Cano" Balaguer, who was defendant Vasquez' s brother-in law.

52) Due to certain disagreements, Virgilio quitted working for William, and moved back to Jamaica Plain, in about August, 1988.

53) Subsequent to the event specified in paragraph 52, supra, Virgilio went to work a part time job at evening time, at the Northeastern University.

54) On October 18, 1988, Virgilio went to work full time during the day at the Boston "Park Plaza" Hotel and Towers, and switched his evening job for schooling in Roxbury Community College, back to it , during college vacations.

55) In about November, 1988, upon agreement with William, Virgilio moved back to the same apartment in Roxbury,  paragraph 44, supra, where he was sharing the floor with their causin "Hector" R. Ruiz.

56) Due to certain disagreements, again, in about April, 1989, Virgilio moved back to Jamaica Plain, where he stayed until about March 1990, paragraph 64, infra.

57) In the summer of 1989, Virgilio went to the Ruizes' apartment to hand  a wedding gift to his causin Hector who  was living therein, then.

58) Hector was marrying Mrs. Mireya, who was the sister in-law of defendant Vasquez, whose wife was also the sister of Cano's wife, Mrs. Marisol.

59) In said occasion that Virgilio was there, paragraph 57, supra, Hector's remarked that he was "perceiving a very bad friction between William and Cano, due to the love triangle

that involved them with Marisol."

60) As Virgilio asked Hector  grounds for his remarks, paragraph 59, supra, Hector pointed to one of the rooms in the apartment and stated that William and Marisol were therein, while Cano was below attending William's market.

61) On or about January 4, 1990, Virgilio had an accident at the Park Plaza, while walking down from the first floor to the mezzanine with a tray of pitchers of water.

62) On January 19, 1990, Santo' second son was born, and as he cried too much, while Virgilio was in convalescence for said accident, as specified in paragraph 61, supra, he (Virgilio) could not sleep well.

63) For the facts specified in paragraphs 61-62, supra, plaintiffs' brother, "Pablo" Ruiz asked Virgilio to move back to Roxbury, where then, Pablo was in charge of said apartment and sharing it with their other brother, "Federico" Ruiz.

64) Virgilio moved back to said apartment, in about March, 1990, paragraphs 44, 61-63, supra.

65) In about March, 1990, while Virgilio was coming back from a morning therapy, he saw Cano, paragraphs 51, 58-60, supra, inside the laundry that was in the corner of Washington and Atherton Streets, which is the very next block from the site in question.

66) As Virgilio approached Cano and asked him why he was looking so stressful and humble, while wiping his tears, Cano told him that "William had broken my marriage of twelve years", in an unfaithful relationship.

67) On about the second quarter of 1990, while Pablo, Federico and Virgilio were gathered in the living room of said apartment, Cano visited them, under the same resentment, paragraph 66.

68) During the course of said visit, paragraph 67, supra, while crying, Cano remarked that he was "going to find Marisol and bring her to William' store and with a gun, I'm going to kill them both, for destroying my happiness."

69) While temporarily staying with Pablo and Federico in Roxbury, Santo approached Virgilio stating that since William had moved his store down to the next block, they (Santo and William), had talked about the availability of the premise.

70) According to Santo, William and Virgilio, upon the facts specified in paragraph 69, supra, they had arrived to the conclusion that due to the fact that Santo did not have a proper legal status, and neither speaked English, it would have been impossible for Santo to install the kind of store that he was thinking about, unless somebody who would be Virgilio, help him in its transaction.

71) Being crystal clear, Santo and Virgilio agreed that Virgilio would help him with the condition that he would not be physically involved in the store, but only for its transaction, due to Virgilio's health problems.

72) From about March, 1990, the premise was in a gradual process that started from cleaning and installation of the store up to the course of its normal organization.

73) Since the lease for the premise under William was active, this was not passed over or signed until August, 1990, with defendant Hamilton.

74) Under the name of "Brothers Fashion & Multiple Services," standing after the family brothers, the store was registered in the City of Boston, on August 16, 1990.

75) The burglar alarm system was installed by defendant Tucker, on September 4, 1990, to be monitored by defendant Leria, through the telephone line from above, the first floor or the Ruizes' apartment.

76) In about the first week of November, 1990, upon a meeting where Virgilio acted as interpreter between Santo and defendant Gold, an agreement for the store insurance coverage was reached .

77) During said meeting, paragraph 76, supra, plaintiffs raised the issue of the alarm for a better price of the insurance policy, which defendant Gold agreed to.

78) During said meeting, paragraphs 76-77, supra, plaintiffs expressed concerns about holdups, as well as bulglaries or robberies, which were the reasons for the installation of the alarm system, too.

79) During said meeting, plaintiffs addressed said concerns, paragraphs 76-78, supra, defendant Gold volunteered a general context of risks, including in the event of fire.

80) During said meeting, paragraphs 76-79, supra, defendant Gold volunteered that in the event of any kind of loss, this had to be proven with proof such as receipts, etc.

81) During said meeting, paragraphs 76-80, upon looking up at the actual goods at the store, defendant Gold agreed with Santo, up to $40,000 (Forty thousand dollars) for the actual coverage of the store.

82) During said meeting, paragraphs 76-81, defendant Gold also added that in the event of receiving expected upcoming goods, Santo and him (Gold) could agree a new increased coverage, later.

83) During said meeting, paragraphs 76-82, upon receiving the first payment, defendant Gold stated that the policy would be processed and sent to the store, later, since this had to go to his carrier, defendant Commerce/Goodus.

84) At about the time that the insurance contract was closed, paragraphs 76-83, supra,